## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

Floyd Johnson,

     Plaintiff,

      v.

Borough of Palmyra and Richard Dreby,

     Defendants.
_____

: 
: 
: 
: Hon. Joseph H. Rodriguez
: 
: Civil Action No. 1:04cv5370 (JHR)
: 
: 
: **MEMORANDUM**
: **OPINION & ORDER**
:

     This matter is before the Court on a Motion for Summary Judgment against claims by Plaintiff Floyd Johnson ("Johnson") alleging that (1) an ordinance passed by Defendant Borough of Palmyra ("Palmyra") violates his equal protection rights and (2) a personnel directive issued by Defendant Palmyra Chief of Police Richard Dreby ("Chief Dreby") violates his First Amendment rights to freedom of speech and freedom of association, as well as his due process and equal protection rights under the Fourteenth Amendment.  For the reasons expressed below, as well as those placed on the record during oral argument on July 24, 2007, the motion by Palmyra and Chief Dreby (collectively the "Defendants") will be granted.

## FACTUAL BACKGROUND

     Since October 7, 1985, Johnson has been employed as a full-time police officer by Palmyra.  (Complaint at 2.)  From 1986 until December 2004, Johnson also worked fifteen hours per week during his off-duty time as a security officer and manager for a local automobile dealership in Palmyra.  (Id.)

## **The Ordinance**

On August 2, 2004, Palmyra enacted Ordinance No. 2004-10 entitled "An Ordinance of the Borough of Palmyra to Govern Outside Employment of Borough Police Officers and Create Escrow Fund for Payment by Private Employers," which affected Palmyra's police officers who performed off-duty security work.  (Id.)  The Ordinance states, in relevant part:

> Members of Palmyra's Police Department . . . are expressly authorized to engage in security related and/or traffic control activities within Palmyra, the Borough of Riverton or the Township of Cinnaminson during their off-duty hours for Private Employers, so long as the arrangements therefore are made with Palmyra, any compensation paid to the officers for such service is channeled through Palmyra, and with the prior approval by the Chief of Police and subject to the terms of the Standard Operating Procedures adopted by the Police Department.

(Statement of Uncontested Material Facts, Exhibit A, Ordinance at 2.)

The Ordinance requires all prospective employers of Palmyra's police officers in an off-duty security capacity to execute a Uniform Agreement to Provide Security-Related And/Or Traffic Control Services By Off-Duty Personnel ("Uniform Agreement"), and obtain approval from the Chief of Police.  (Id. at 3.)  The Ordinance and its associated Uniform Agreement governs the payment, indemnification, authorization, and hiring of the off-duty officers:

> Section 1: Services to be Provided
>
> Palmyra Police Department shall provide to the Private Employer the security-related services described below . . . .
>
> Section2: Compensation
>
> A. Compensation for the Employee's activities shall be calculated at Forty-Five ($45.00) Dollars per hour of work by the Employee plus Three ($3.00) Dollars per hour to Palmyra for any administrative fee for each hour worked

by the Employee. The Private Employer shall pay . . . in advance, to Palmyra . . . to maintain an appropriate escrow account . . . for the Employee's work. Palmyra shall then pay the Employee out of said fund . . . .

\*\*\*

D. Private Employer's payment of escrow is a condition precedent to Employee working for Private Employer **. . . .**

Section 3: Limitation of Palmyra Authorization

[E]ven though it is the public policy of Palmyra to permit off-duty police officers to perform security-related activities . . . because of the benefit to be derived by all persons living in or proceeding through Palmyra, the permission granted by the governing body through the aforementioned Ordinance does not extend to any activities not reasonably related to the activities described herein and at no time shall the Employee be deemed to be an agent of Palmyra while performing these activities.

Section 4: Application of Insurance Coverages

[T]he Private Employer shall provide adequate workmen's compensation insurance and/or private liability insurance coverage for the Employee of the Private Employer's expense . . . . In addition, Private Employers shall provide Palmyra with proof of insurance coverage showing that Palmyra has been named as an additional insured on the Private Employer's insurance policy for the period for which the services contemplated under this Agreement are necessary. Said insurance shall provide coverage up to $1 Million Dollars for general liability single accident insurance; and $2 Million Dollars in the aggregate.

Section 5: Hold Harmless; Indemnification

The Private Employer indemnify and hold harmless Palmyra . . . from any liability or damages they may suffer as a result of claims, demands, costs or judgments against them arising out of the Employee's activities under and pursuant to this contract.

\*\*\*

Any questions as to whether the Employee was acting in his capacity as a police officer for Palmyra, or as an Employee/Agent of the Private Employer at the time the claim or demand or cause of action arose, shall be resolved in favor of Palmyra, with the Private Employer providing indemnification to, and holding Palmyra harmless from any such claims.

(Statement of Uncontested Material Facts, Exhibit A, Uniform Agreement.)

3

On its face, the Ordinance offers several safety and disciplinary justifications. (Statement of Uncontested Material Facts, Exhibit A, Ordinance at 1.)  Specifically, the Ordinance offers the following justifications:

> Whereas, it is deemed to be in the best interests of the citizens of this community, and would contribute to the overall safety and general welfare of all persons living in or traveling through Palmyra, for members of the Police Department, when available, to provide traffic control or security-related services for separate entities; and

> Whereas, it is also deemed to be in the best interests of the municipality to provide coordination and administration through the local government of security- related services provided by Palmyra Police Officers, and to have said officers subject to departmental discipline and control while performing such services;

> ***

> Whereas, the governing body seeks to protect Palmyra and its Officers from liability in connection with such work and to establish certain guidelines and regulations governing such work.

(Id.)

Additional justifications for the Ordinance were proffered by Palmyra during the discovery process.  Palmyra's mayor testified in a deposition that other Burlington County boroughs had similar ordinances, (Statement of Uncontested Material Facts, Exhibit B, Deposition of John Gural at 66), and that the Ordinance was adopted "in part by a ruling handed down by the State of New Jersey."  (Id. at 61.)  Chief Dreby also testified that he authored the Ordinance by modeling it after similar ordinances in Burlington Township and Cinnaminson.  (Statement of Uncontested Material Facts, Exhibit G, Deposition of Richard Dreby at 15.)  Moreover, Chief Dreby testified that the Ordinance removed the possible appearance of impropriety resulting from a police officer being paid through a private employer, rather than through the municipality. (Id. at 20.)

4

Moreover, Palmyra alleges it enacted the Ordinance to comply with governmental directives issued by various bodies of the New Jersey state government.  Specifically, Palmyra alleges it considered a Local Finance Notice dated November 8, 2000, entitled "Managing and Accounting for Outside Employment of Police Officers," which states that municipal police officers are permitted to serve as security officers in their off-duty hours "only if an arrangement has been made between the private persons or entities and the employing municipality."  (Statement of Uncontested Material Facts, Exhibit C, Local Finance Notice at 1.)  Furthermore, Palmyra contends it relied upon an August, 1989, memo from the New Jersey Division of Pensions on the subject of "Off-Duty or Outside Employment by Police Officers," which concludes that an officer not receiving his regular compensation and not performing his regular or assigned duties is not subject to the accidental disability or death provisions of the police retirement system. (Statement of Uncontested Material Facts, Exhibit E, Division of Pensions Memo.) Additionally, Palmyra alleges that Attorney General Opinion 1977– No. 23, informed its opinion to adopt the Ordinance.  (Statement of Uncontested Material Facts, Exhibit D, Opinion.)  Attorney General Opinion 1977– No. 23 states that: "A direct relationship between the policeman and the private party would violate the requirements of the Private Detective Act of 1939" but that police officers engaged in off-duty security work may do so "if arrangements are made with the employing municipality."  (Id.)

During discovery, Palmyra also proffered justifications for the $45.00 per hour rate the Ordinance required outside employers to pay to Palmyra police engaged in off-duty security work.  In his deposition, Palmyra's mayor testified that other towns with similar ordinances required similar compensation, and that $45.00 per hour reflects the

average overtime salary that an officer exceeding a forty-hour work week would be paid. (Statement of Uncontested Material Facts, Exhibit B, Deposition of John Gural at 80.) Moreover, the mayor contended that the $45.00 figure was arrived at after consultation with Palmyra's police officers. (Id.)

After the Ordinance was passed, Johnson's role at the automobile dealer changed, in that Johnson ceased working as head of security and instead works as a gofer for the dealer's owner, by driving, getting groceries, and running errands. (Statement of Uncontested Material Facts, Exhibit H, Deposition of Floyd Johnson at 71-72.) Johnson has, however, worked other off-duty security assignments in accordance with the Ordinance. (Id. at 91-92.) The off-duty security jobs that Johnson has worked have been allocated to him as part of the system adopted by the Police Department in response to the Ordinance, which distributes assignments on a rotating basis to all officers in the department. (Statement of Uncontested Material Facts, Exhibit H, Deposition of Floyd Johnson at 91-92.)

## Personnel Directive Regarding Police-Related Schools

On October 11, 2005, Chief Dreby issued a memorandum, stipulating that "no personnel will attend any police related schools whether it be on your time and expense or the Borough's time and expense unless authorized by the Chief of Police." (Statement of Uncontested Material Facts, Exhibit I, Memo.) In a follow-up memo dated December 9, 2005, Chief Dreby defined police-related schools as those where admittance depends on one's status as a police officer. (Statement of Uncontested Material Facts, Exhibit J, Memo.)

In his deposition, Chief Dreby testified that the rationale behind this directive

6

was to prevent the Palmyra Police Department from incurring liability from the actions

of a Palmyra police officer acting under color of law while attending a police-related

school.  (Statement of Uncontested Material facts, Exhibit G, Deposition of Richard

Dreby at 44.)   Moreover, the memo regarding the directive issued by Chief Dreby

suggested that the directive's purpose was to shield Palmyra from liability.  (Statement

of Uncontested Material Facts, Exhibit I, Memo.)  In his deposition, Johnson testified

that he believes the Chief has a legitimate interest in knowing what training his

subordinate officers are getting.  (Statement of Uncontested Material Facts, Exhibit H,

Deposition of Floyd Johnson at 113.)

Since Chief Dreby's October 11, 2005, directive Johnson has attended four police-

related schools.  (Statement of Uncontested Material Facts ¶ 37, Exhibit K.)  On three of

these occasions, Palmyra paid the course fees.  (Statement of Uncontested Material

Facts ¶ 38, Exhibit L.)

## PROCEDURAL HISTORY

On November 3, 2004, Johnson filed a Complaint under 42 U.S.C. § 1983,

alleging that the Ordinance violates the Equal Protection Clause and the Due Process

Clause of the Fourteenth Amendment.  (Complaint at 4-6.)  Palmyra then filed a Motion

to Dismiss pursuant Fed. R. Civ. P. 12(b)(6).  (Court Order on Motion to Dismiss at 5.)

In an order dated September 28, 2005, this Court granted Palmyra's motion to dismiss

the due process claim, but allowed the equal protection claim to survive.  (Id. at 21.)

On March 9, 2006, Johnson filed a Supplemental Complaint under 42 U.S.C. §

1983, alleging that the personnel directive regarding police-related schools violated (1)

the First Amendment guarantees of freedom of speech and freedom of association and

(2) equal protection and due process rights under the Fourteenth Amendment. (Supplemental Complaint at 4-6.)  The Supplemental Complaint named Chief Dreby, who had issued the personnel directive, as a Defendant.  (Id. at 1-2.)

## DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).  An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify

specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

### B. Standard for 42 U.S.C. § 1983 Action

The federal civil rights statute at issue, 42 U.S.C. § 1983, "is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred." Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979).  To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury.  Benn v. Universal Health Sys., 371 F.3d 165, 170 (3d Cir. 2004).

A plaintiff may be entitled to relief in the context of a § 1983 claim if the complaint "sufficiently alleges a deprivation of any right secured by the constitution." D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1367 (3d Cir. 1992).  The complaint will be deemed to allege sufficient facts if it is adequate to "put the proper defendants on notice of the essential elements of plaintiffs' cause of action." Dist. Council 47, AFSCME v. Bradley, 795 F.2d 310, 313 (3d Cir. 1986).

On this motion for summary judgment the Court is considering three claims: (1) that the "ordinance has deprived the plaintiff of his right to equal protection of the law in violation the Fourteenth Amendment" (Complaint at 5); (2) that the personnel directive regarding police-related schools violates First Amendment guarantees of freedom of speech and freedom of association, and (3) that the personnel directive regarding police-related schools violates due process and equal protection rights under

the Fourteenth Amendment.[1]  (Supplemental Complaint at 4-6.)

### C. Whether Summary Judgment Should be Granted on Johnson's Claim that the Ordinance Violates his Equal Protection Rights Under the Fourteenth Amendment

For summary judgment to be appropriate, no disputed material fact may exist. Celotex Corp., 477 U.S. at 330.  Here, no dispute exists as to whether the Ordinance satisfies the rational basis standard, which is the appropriate level of scrutiny for a legislative enactment that does not infringe upon a fundamental right or suspect class to withstand an equal protection challenge.[2]  See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985) (holding that legislation is generally presumed to be valid if the classification is rationally related to a legitimate state interest, unless the classification is based on race, national origin or alienage, which require strict scrutiny.) Given that no genuine issue of material fact exists, Palmyra's motion for summary judgment on Johnson's claim that the Ordinance violates his equal protection rights is granted.

---

[1]As an initial matter, the Court notes that the Fifth Amendment is not implicated in this case, as the federal government is not accused of any wrongdoing.  While in his Supplemental Complaint Johnson alleged violation of his due process and equal protection rights under the Fourteenth Amendment only, in his Brief Johnson suggests that his due process and equal protection rights under the Fifth Amendment were violated as well.  Because the Fifth Amendment protects against wrongdoing by the federal government, Kelly v. Borough of Sayreville, 107 F.3d 1073, 1076 (3d Cir. 1997), and Johnson has alleged no such wrongdoing on the federal government's part, the Court will consider only Johnson's allegations of his Fourteenth Amendment rights to due process and equal protection.

[2]While Johnson contends that the Ordinance creates two classes of off-duty police officers, those who provide security services and those who perform non-security work, such a classification is not suspect.  See United States v. Williams, 124 F.3d 411, 422 (3d Cir. 1997) (stating that suspect classes are those based on race, national origin, or alienage).

### 1. Whether the Ordinance's Indemnity Provision Passes the Rational Basis Test

Analyzing an equal protection claim under the rational basis test is a two-step process.  The rational basis test requires that (1) the legislation reflects a legitimate state interest and (2) the classification created by the legislation be rationally related to the legitimate state interest.  Bowman v. Twp. of Pennsauken, 709 F. Supp. 1329, 1340, 1342 (D.N.J. 1989).  The rational basis test is a low standard of review, and accords much deference to legislative choices.  See Brian B. v. Commonwealth of Pennsylvania Dep't of Educ., 230 F.3d 582, 586 (3d. Cir. 2000) ("[A] law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous"); Salem Blue Collar Workers' Ass'n v. City of Salem, 33 F.3d 265, 271 (3d Cir. 1994) (holding that a law need only be "not irrational" in order to be sustained under the rational basis test).

Despite the rational basis test's low threshold for upholding legislative classifications that are not based on a suspect class or fundamental right, this Court has previously held that shifting the entire burden of liability for an off-duty police officer's actions onto the private third-party that employs him in his off hours is not a legitimate government interest.  Bowman, 709 F. Supp. at 1340.

While New Jersey courts have not directly addressed whether total indemnification by private employers to municipal police departments is a permissible government interest, the Superior Court of New Jersey, Appellate Division concluded that police departments and private employers, in the absence of an express indemnification agreement, should share in the compensation burden when an off-duty

police officer incurs liability while performing security detail for the private employer. Domanoski v. Borough of Fanwood, 568 A.2d 123, 127 (N.J. Super. Ct. App. Div. 1989). However, the court in Domanoski left open the possibility that a total shift in liability might be appropriate among joint employers when it opined that "[l]ocal police departments that undertake similar approved programs permitting and regulating the off-duty security-guard employment of their personnel by private employers might well consider requiring private employers to execute such indemnification as a condition of participation." Id.

Here, while the Ordinance is somewhat ambiguous as to whether the entire burden of liability shifts from the Palmyra Police Department to the private employer in all situations, statements made during oral argument satisfy the Court that in fact, the Ordinance does not intend to shift all liability in every case. The Hold Harmless; Indemnification provision of the Uniform Agreement required by the Police Department before an officer can engage in off-duty security work stipulates that:

> The Private Employer undertakes to indemnify and save harmless Palmyra . . . . from any liability or damages they may suffer as a result of claims, demands, costs or judgments against them arising out of the Employee's activities under and pursuant to this contract . . . . Any questions as to whether the Employee was acting in his capacity as a police officer for Palmyra, or as an Employee/Agent of the Private Employer at the time the claim or demand or cause of action arose, shall be resolved in favor of Palmyra, with the Private Employer providing indemnification to, and holding Palmyra harmless from any such claims.

(Statement of Uncontested Material Facts, Exhibit A, Ordinance, Uniform Agreement at 5.) The first part of the provision, specifically the language stipulating that "costs or judgments against them arising out of the Employee's activities under and pursuant to

this contract" will be subject to indemnity suggests liability shifts in its entirety only when the off-duty officer incurs liability for acts undertaken solely as part of the officer's responsibility to the third-party private employer.  The latter half of the provision however, specifically the language stipulating that "any questions . . . shall be resolved in favor of Palmyra," may suggest that the entirety of liability shifts from the Police Department to the third-party employer in all instances.

During oral argument, however, Palmyra clarified that liability would shift only in situations where the off-duty officer was acting pursuant to the officer's responsibilities to the third-party employer.  Specifically, Palmyra contended that the language "any questions . . . shall be resolved in favor of Palmyra" is not ambiguous, but rather suggests that liability does not shift in every case, since it allows for questions about liability to be raised.  Thus, the Court is satisfied that the indemnification provision in the Ordinance is a permissible government interest.

In its brief, Palmyra set forth a voluminous number of justifications for the Ordinance.  Palmyra pointed to the language of the Ordinance, as well as to testimony revealed in discovery to satisfy its burden of proving that the Ordinance meets the rational basis criteria.  Thus, given Palmyra's many justifications for the Ordinance and its clarification of the indemnity provision during oral argument, the rational basis test's low burden is met.

### 2. Whether Ordinance's $45.00 per Hour Rate Passes the Rational Basis Test

While this Court previously denied Palmyra's motion to dismiss in part on the grounds that the Ordinance's requirement that private employers pay $45.00 per hour to the off-duty police officers they employ may not satisfy the rational basis test,

(Opinion at 19), the evidence now provided by Palmyra why it set its rate at this level assures this Court that the $45.00 per hour wage is rationally related to a legitimate government interest.

Here, Palmyra has demonstrated that it had a legitimate government interest in complying with New Jersey state directives, which stipulated that municipalities regulating the off-duty employment of police officers must ensure that private employers pay salaries that conform with the Fair Labor Standards Act. (Statement of Uncontested Material Facts, Exhibit C, Local Finance Notice at 2; Palmyra's Brief at 18-19.) Moreover, Palmyra also carried its burden of demonstrating that the $45.00 per hour wage is rationally related to comply with the Fair Labor Standards Act. Specifically, the deposition of Palmyra's mayor shows that the Ordinance's wage requirement comports with wages set by similar ordinances in neighboring towns and the overtime paid to Palmyra police. (Statement of Uncontested Material Facts, Exhibit B, Deposition of John Gural at 80.) Moreover, the mayor testified that the $45.00 per hour wage was arrived at after negotiations with Palmyra's officers. (Id.) Thus, Palmyra has satisfied this Court that the $45.00 per hour wage passes the muster of the rational basis test.

### D. Whether Summary Judgment Should be Granted on Johnson's Claim that the Personnel Directive Violates his Constitutional Rights

Johnson has failed to offer evidence that would allow a reasonable jury to return a verdict in his favor on any of the four allegations of constitutional violations.

### 1. Whether the Personnel Directive Infringes on Johnson's First Amendment Right to Freedom of Speech

While public employees do not relinquish their free speech rights as a

14

consequence of their public employment, they do not enjoy unfettered First Amendment rights. McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005) (citations omitted). The Third Circuit uses a three-step test to determine whether a public employee's speech deserves First Amendment protection. Id. In order to be protected by the First Amendment, a public employee's speech must (1) address a matter of public concern; (2) outweigh the state's interest in promoting efficiency in the workplace and avoiding workplace disruption, and (3) have been a substantial motivating factor in the alleged retaliatory action by the employer. Id.

Thus, as a threshold inquiry, the court must consider whether a plaintiff's speech addressed a matter of public concern. Speech that is a matter of public concern is that which relates to political, social and other concerns of the community. Connick v. Myers, 461 U.S. 138, 146 (1983). Thus, in Connick, the Supreme Court ruled that an assistant district attorney's speech about district attorneys being pressured to work in political campaigns was a matter of public concern, while the district attorney's solicitation of colleagues' view on office morale, policy for employee transfers, the need for a grievance committee and level of confidence in supervisors were matters of personal concern. McGreevy, 413 F.3d at 365. Speech by public employees that addresses only personal issues is not deserving of First Amendment protection. Connick, 461 U.S. at 147.

Here, Johnson has failed to establish that his speech was infringed upon. Neither Johnson's Supplemental Complaint nor his brief opposing Palmyra's motion for summary judgment alleges an aspect of speech infringed upon by the personnel directive. Nonetheless, this Court will assume that the speech Johnson alludes to is

15

speech that objected to the personnel directive.  Even assuming this however, Johnson fails to meet the threshold requirement for First Amendment protection, in that such speech is a matter of personal, rather than public concern.

Any speech that Johnson may have uttered about the personnel directive could not be categorized as a political, social or other matter of community concern, since the personnel directive concerns only the ability of Palmyra police officers to attend police-related trainings without approval from Chief Dreby.  In fact, the language of the directive demonstrates that the directive was the antithesis of a community concern. For example, the December 9, 2005 memo issued by Chief Dreby states that those courses requiring approval are only those that restrict attendance to police officers. (Statement of Uncontested Material Facts, Exhibit J, Memo.)  Conversely, the memo states that "those schools that any civilian can attend would not need approval from this office."  (Id.)  Thus, by its nature the personnel directive is not a matter of community concern because it is limited to courses where police status is a prerequisite.

Thus, Defendants' motion for summary judgment on Johnson's claim that his First Amendment freedom of speech rights were violated by the personnel directive is granted.

### 2. Whether the Personnel Directive Infringes on Johnson's First Amendment Right to Freedom of Association

When a public employee alleges that government legislation violates his associational rights under the First Amendment, courts usually employ a balancing test to weigh the interest of the employee in associating against the interest of the government in managing its employees and providing efficient service to the public.

Kirchgessner v. Wilentz, 884 F. Supp. 901, 910 (D.N.J. 1995), aff'd, 92 F.3d 1171 (3d Cir. 1996).  In rarer cases, for example when disciplinary action against a public employee results in a discharge or threat of discharge, or when employees are prohibited from unionizing, courts will employ the strict scrutiny test, which burdens the government to show that the infringing legislation serves a vital interest.  Id. at 910-11.

While Johnson argues that strict scrutiny should be used here, the case he relies upon to justify the rigorous standard does not apply the standard, and is furthermore distinguishable from the facts of this case.  Johnson cites Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d 435, 446 ( 3d Cir. 2000), to sustain his contention that "[t]he most rigorous standard of review is triggered when the state action directly burdens expressive rights."  (Plaintiff's Brief at 23.)  However, in Pi Lambda, the Third Circuit endorsed not strict scrutiny, but rather the lowest standard of review to evaluate the defendant university's infringement on the alleged associational rights of plaintiff fraternity members.  229 F.3d at 446-47.  Moreover, Pi Lamda is distinguishable from this case because it did not implicate First Amendment freedoms of public employees, as this case does.  First Amendment analysis in cases involving public employees is different from First Amendment analysis where members of the general public are involved.  See Waters v. Churchill, 511 U.S. 661, 675 (1994) (explaining that "[t]he government cannot restrict the speech of the public at large just in the name of efficiency.  But where the government is employing someone for the very purpose of achieving its goals, such restrictions may well be appropriate.")

Given the facts of this case, the balancing test will be employed to determine if the Palmyra Police Department's interest in approving the police-related schools

17

attended by its officers outweighs Johnson's associational rights to obtain officer training.  The district court of New Jersey used the balancing test in <u>Kirchgessner</u>, an analogous case, when it upheld a ban on plaintiff probation officers' association in police organizations, since the court deemed plaintiffs' right to associate to be trumped by the defendant New Jersey Supreme Court's interest in maintaining impartiality among probation officers.  884 F. Supp. at 913.

This case is similar to <u>Kirchgessner</u> in that the employers in both cases sought to restrict the group affiliation of the plaintiffs, when the desired association had a direct link with plaintiff employees' official duties.  <u>Id.</u> at 911.  In <u>Kirchgessner</u>, defendant New Jersey Supreme Court's ban on plaintiff probation officers' membership in police organizations was directly related to the plaintiffs' employment.  <u>Id.</u>  Here, Defendants' attempt to oversee Johnson's attendance in police-related schools directly correlates with Johnson's employment as a police officer.  (Statement of Uncontested Material Facts, Exhibit J, Memo.)  Thus, this case is not similar to the hypotheticals proffered by Johnson, where an employer prohibits an employee with an associate's degree from attending a four-year college on his own time and expense, or where an automobile salesman is prohibited by his employer from taking an art course.  (Plaintiff's Brief at 25.)

Moreover, the personnel directive, requiring authorization before an officer may attend training courses, at issue here infringes on Johnson's associational rights less than the total ban did in <u>Kirchgessner</u>.  Here, the directive does not prohibit, completely, Palmyra officers from attending police-related schools.  The record shows that Johnson has attended at least four such trainings since the issuance of the directive, (Statement

of Uncontested Material Facts ¶ 37, Exhibit K), and that the Police Department has paid for three of those trainings. (Statement of Uncontested Material Facts ¶ 38, Exhibit L.) Thus, Johnson's argument that the directive inhibits his right to freedom of association is not persuasive.

Even assuming that the directive did infringe on Johnson's ability to associate, Defendants have articulated a valid interest in approving police trainings attended by Palmyra officers.  Chief Dreby's memo suggests that the Department wanted to protect against liability from actions its officers might take under color of law while attending the police trainings.  (Statement of Uncontested Material Facts, Exhibit J, Memo.)  Chief Dreby affirmed that this was the purpose of the directive when he testified that he issued the directive to protect Palmyra from liability.  (Statement of Uncontested Material Facts, Exhibit G, Deposition of Dreby at 44.)   In addition, Johnson admitted, in his deposition, that Chief Dreby has a legitimate interest in knowing what trainings his officers are receiving.  (Statement of Uncontested Material Facts, Exhibit H, Deposition of Richard Dreby.)  Thus, the facts of the case make it clear that any infringement placed on Johnson's right to association by the personnel directive is trumped by the valid interest of Palmyra, his employer, in protecting itself against liability.

Defendants have met their burden of showing that no genuine triable issue exists regarding Johnson's First Amendment freedom of association claim on the personnel directive, by showing that the directive, which was justified by Palmyra's interest in shielding itself from liability, did not impede Johnson's ability to associate. Thus, Defendants' motion for summary judgment on Johnson's claim that his First Amendment freedom of association rights were violated by the personnel directive is

granted.

### 3. Whether the Personnel Directive Violates Johnson's Due Process Rights under the Fourteenth Amendment

The Fourteenth Amendment to the United States Constitution prohibits deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The first step in analyzing a due process claim is to determine whether the "asserted individual interest . . . [is] encompassed within the [F]ourteenth [A]mendment's protection of life, liberty, or property." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).

Johnson's Supplemental Complaint alleges that he was deprived of his property right in his employment as a police officer because the personnel directive adversely affects his ability to improve his education and training. (Supplemental Complaint ¶ 9.) State law creates the property rights protected by the Fourteenth Amendment. Kelly, 107 F.3d at 1077. Specifically, "[t]he hallmark of a constitutionally protected property interest is an individual entitlement that cannot be removed except 'for cause.'" Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1078 (3d Cir. 1990) (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982)). Under New Jersey law, police officers do have a property right in their employment. Kelly, 107 F.3d at 1077. New Jersey law holds that:

> Except as otherwise provided by law, no permanent member or officer of the police department or force shall be removed from his office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established for the government of the police department and force, nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment, or position therein, except for just cause as hereinbefore provided and then only upon a written complaint setting forth the charge or

charges against such member or officer.

Id. (citing N.J. Stat. Ann. § 40A: 14-147).

However, even though Johnson has a property interest in his employment as a police officer under New Jersey state law, he does not allege that the personnel directive has deprived him of this property right.  Instead, his Supplemental Complaint is more abstract, in essence asserting that he has been deprived of his property interest in his employment as a police officer by virtue of needing permission from Chief Dreby to attend police-related schools.  (Supplemental Complaint at 2-3.)  Thus, Johnson's alleged property loss is as amorphous as the plaintiff's alleged property loss in Kelly, which the Third Circuit held not to be a cognizable property loss under the Due Process Clause.  107 F.3d at 1077 (opining that the defendant's filing of groundless disciplinary charges against the plaintiff "without particular adverse employment action" did not constitute a cognizable property loss under the Due Process Clause).

Johnson puts forth no evidence that shows that under New Jersey law he has a property interest in being able to attend police-related schools.  Moreover, even if he had an entitlement to attend police-related schools, the personnel directive requiring authorization from Chief Dreby to attend such courses is not a deprivation of that right.  Both the October 11, 2005 and the December 9, 2005 memos make clear that the directive requires merely that an officer receive authorization from Chief Dreby before attending a seminar.  (Statement of Uncontested Material Facts, Exhibits I-J.)  Moreover, Johnson has attended four police-related schools since the issuance of the personnel directive, (Statement of Uncontested Material Facts ¶ 37, Exhibit K), and the Police Department has paid for three of those trainings. (Statement of Uncontested

Material Facts ¶ 38, Exhibit L.)  Johnson's subsidized attendance at police-related schools after the issuance of the personnel directive underscores Palmyra's assertion that Johnson has not been subjected to a constitutional deprivation pursuant to the directive.  (Defendants' Brief at 21.)

The second step in a due process analysis is whether procedures available allowed the plaintiff to avail himself of due process of the law.  Alvin, 227 F.3d at 116. Thus, in order for a plaintiff to recover on a due process claim, the plaintiff must have taken advantage of the due process procedures provided, so long as those procedures were adequate and available.  Id.  Furthermore, "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts to get back what he wants."  Id.  In Alvin, the Third Circuit held that the plaintiff professor's due process claims failed since he had not used fully the university grievance procedure to air his complaints.  Id. at 116-17.   The Court in Alvin opined that even though the plaintiff had written informal letters to university administrators regarding his grievances, and thus invoked in some way the procedural due process provided by the university, "[o]ur sentiments do not change the requirement that one use the procedures available. . . [plaintiff's] battery of letters to the right people in the wrong manner . . . does not allow him to sustain a claim that the procedures he did not use were constitutionally flawed."  Id. 117-18.

Here, Johnson's due process claim fails because he did not avail himself of the due process procedures provided by the Police Department.  The Palmyra Police Department has an established mechanism for processing complaints vis-a-vis the Collective Bargaining Agreement established between Palmyra and the Palmyra Police

Association.  (Statement of Uncontested Material Facts, Exhibit M, Collective

Bargaining Agreement at 4-8.) While Johnson could have used this grievance

mechanism in an attempt to repeal this directive, (Statement of Uncontested Material

Facts, Exhibit G, Deposition of Chief Dreby at 43), he has not alleged that he filed even a

Level One grievance in regard to his discontent with Chief Dreby's personnel directive.

In Alvin, the plaintiff at least had initiated some lower level grievances before

proceeding to the court for redress.

　　　　Defendants have met their burden of showing that no genuine triable issue exists

regarding Johnson's due process claim on the personnel directive because he has not

alleged a constitutional deprivation of his property interest.  He also has failed to avail

himself of the Police Department's grievance procedures.  Thus, Defendants' motion for

summary judgment on Johnson's claim that his due process rights were violated by the

personnel directive is granted.

### 4. Whether the Personnel Directive Violates Johnson's Equal Protection Rights under the Fourteenth Amendment

　　　　The Equal Protection Clause of the Fourteenth Amendment commands that no

State shall "deny to any person within its jurisdiction, the equal protection of the laws."

U.S. Const. amend. XIV, §1.  The Equal Protection Clause directs that "all persons

similarly situated should be treated alike."  Cleburne, 473 U.S. at 439.  Thus, the Equal

Protection Clause's dictate that the state governs impartially means that laws uniformly

governing all classes of people do not violate the Equal Protection Clause.  See

Alexander v. Whitman, 114 F.3d 1392, 1406 (3d Cir. 1997) (ruling that "'general rules

that apply evenhandedly to all persons within the jurisdiction unquestionably comply'

23

with the Equal Protection Clause") (quoting New York City Transit Auth. v. Beazer, 440 U.S. 568, 587-88 (1979)).  Likewise, only when a law affects in a special way fewer than all people subject to the law's jurisdiction is the Equal Protection Clause implicated.  Id.

Here, Johnson never alleges that the personnel directive treats him differently from other Palmyra police officers subject to the directive.  Furthermore, all evidence produced during discovery suggests that the personnel directive treats all Palmyra police officers similarly.  Both memos relating to the directive suggest that no personnel are permitted to attend police-related schools without Chief Dreby's permission. (Statement of Uncontested Material Facts, Exhibits I and J.)  Additionally, nothing in Chief Dreby's deposition suggests that the personnel directive applies to fewer than all Palmyra police officers.  (Statement of Uncontested Material Facts, Exhibit G, Deposition of Chief Dreby at 42-51.)  Even Johnson's own deposition suggests that he is on an equal footing with other Palmyra police officers in terms of the number of police-related schools he has attended.  (Statement of Uncontested Material Facts, Exhibit H, Deposition of Johnson at 115.)

In addition to legislation that treats different classes disparately, legislation infringing on a fundamental right may implicate the Equal Protection Clause.  However, fundamental rights are discrete in that they only exist to the extent that the Constitution has classified them as such.  For example, in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 35 (1973), the Court echoed an earlier statement from Shapiro v. Thomson, which disavowed the Court of any responsibility for creating fundamental rights.  The Court in Rodriguez stated that it is not the province of the Court to "'pick out particular human activities, characterize them as 'fundamental,' and give them added

24

protection . . .' To the contrary, the Court simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands." Id. (quoting Shapiro, 394 U.S. 618, 642 (1969)).  Thus, despite that the Court in Rodriguez acknowledged the importance of education, it nevertheless held that "[e]ducation . . . is not among the rights afforded explicit protection under our federal constitution.  Nor do we find any basis for saying it is implicitly so protected."  411 U.S. at 35.

As stated earlier, Johnson does not allege a fundamental right in his Supplemental Complaint.  Instead, his Supplemental Complaint is more amorphous in its suggestion that the directive has limited his ability to improve his officer education and training.  (Supplemental Complaint ¶ 9.)  However, as stated in Rodriguez, the Constitution provides no fundamental right to education.  Thus, Johnson has no fundamental right to attend police-related schools without approval.

Despite that Defendants have met their burden of showing that no genuine triable issue exists regarding Johnson's equal protection claim on the personnel directive, Johnson has alleged neither that the personnel directive has caused him to be treated differently from other Palmyra police officers nor that the directive infringes on a fundamental right.  Thus, Defendants' motion for summary judgment on Johnson's claim that his equal protection rights were violated by the personnel directive is granted.

## **CONCLUSION**

For the reasons stated above,

IT IS ORDERED on this 2nd day of August, 2007 that Defendants' motion for summary judgment is <u>GRANTED</u>.

      /s/Joseph H. Rodriguez  

JOSEPH H. RODRIGUEZ

U.S.D.J.

26